UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CPC LOGISTICS, INC., et al., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV774 JCH |
| | ) | |
| INTERNATIONAL PAPER COMPANY, | ) | |
| | ) | |
| Defendant(s). | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment, and Plaintiffs' Motion for Summary Judgment, both filed July 3, 2012. (ECF Nos. 61, 65). The motions are fully briefed and ready for disposition.

**BACKGROUND**

On or about December 17, 2000, Plaintiff CPC Logistics, Inc. (formerly known as Consolidated Personnel Corp.) ("CPC Logistics") entered into a Driver Lease Agreement with Defendant International Paper Company. (First Amended Complaint ("Compl."), ¶¶ 6, 7). Pursuant to the terms of the Driver Lease Agreement, CPC Logistics agreed to provide Defendant with the services of duly trained, professional truck drivers for purposes of supporting Defendant's transportation operations, and in return, Defendant agreed to pay CPC Logistics for such services in accordance with the specific payment schedules attached to and incorporated by reference into the Driver Lease Agreement. (Id., ¶ 9). Per the terms of the payment schedules allegedly covering drivers provided to Defendant's Mason, Ohio, and Fond du Lac, Wisconsin, transportation operations, Defendant agreed to pay CPC Logistics certain Wage Rates, Applicable Taxes and Workers' Compensation Rates, and "Direct Charges," defined as follows:

> Direct charges are [CPC Logistics'] rates for wages and fringe benefits (initial rates listed below), as well as payments [CPC Logistics] makes under the Agreement to or for the benefit of workers covered by this Schedule "A" or in connection with the services provided to customer.  Direct charges also include without limitation, amounts paid pursuant to any applicable collective bargaining agreement, any law or regulation, or any judgment or other resolution of a dispute, as well as costs incurred for road expenses (tolls, scale fees and the like), uniforms, and cash advances paid to workers.

(Compl., ¶ 11, and att. Exhs. B, C). According to CPC Logistics, effective January 1, 2006, CPC Logistics assigned certain of its operational functions under the Driver Lease Agreement to Plaintiffs CPC Services, Inc., a wholly owned subsidiary of CPC Logistics, and CPC Paper & Packaging, LLC, a wholly owned subsidiary of CPC Services, Inc. (Id., ¶ 12).[1]

During the period of time that CPC provided services to Defendant under the Driver Lease Agreement, certain of CPC's employees assigned to Defendant's operations were covered by collective bargaining agreements with Teamsters Local Union No. 100 (representing employees assigned to Defendant's facility in Mason, Ohio), and Teamsters Local Union No. 200 (representing employees assigned to Defendant's facility in Fond du Lac, Wisconsin). (Compl., ¶ 16). Pursuant to those collective bargaining agreements, CPC was required to make specified pension contributions into the Central States, Southeast and Southwest Areas Pension Fund ("Central States Pension Fund"), a multiemployer pension plan within the meaning of Sections 3(37) and 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1002(37) and 1301(a)(3), for those employees assigned to Defendant's Mason, Ohio, and Fond du Lac, Wisconsin, locations. (Id., ¶¶ 1, 17). During the period that CPC provided services to Defendant at those locations under the Driver Lease Agreement, CPC made the contractually required contributions, and Defendant reimbursed CPC for the pension contributions. (Id., ¶ 18).

---

[1] For convenience, the Court refers to Plaintiffs collectively as "CPC."

On or about April 9, 2007, Defendant terminated CPC's services at its Mason, Ohio facility, and CPC thereafter ceased making further pension contributions to the Central States Pension Fund on behalf of those employees who had been providing services to Defendant at this location. (Compl., ¶ 19). On or about September 30, 2009, CPC ceased providing services to Defendant at its Fond du Lac, Wisconsin facility, and CPC thereafter ceased making further pension contributions to the Central States Pension Fund on behalf of those employees who had been providing services to Defendant at this location. (Id., ¶ 20). On or about December 1, 2009, CPC's obligation to contribute to the Central States Pension Fund in respect of any collective bargaining agreement permanently ceased, thereby effecting a "complete withdrawal" from the fund, as defined in Section 4203(a) of ERISA, 29 U.S.C. § 1383(a). (Id., ¶ 21). As a result of this complete withdrawal, CPC and members of its controlled group of companies were assessed withdrawal liability pursuant to Section 4201(b) of ERISA, 29 U.S.C. § 1381(b), in the principal amount of $9,770,183.71. (Id., ¶ 22). CPC received a notice and demand for payment of the 2009 withdrawal liability from the Central States Pension Fund on or about April 22, 2010. (Id., ¶ 23).[2]

From May, 2010, through March, 2011, CPC made monthly interim withdrawal liability payments to the Central States Pension Fund. (Compl., ¶ 26).[3] On or about March 18, 2011, CPC entered into a settlement agreement with the Central States Pension Fund, which required CPC to

---

[2] On or about October 19, 2010, CPC and its controlled group members received a revised letter of notification, assessing an adjusted 2009 withdrawal liability in the amount of $9,746,204.23. (Compl., ¶ 24).

[3] On or about September 28, 2010, CPC began invoicing Defendant for the amount of interim withdrawal liability payments it paid that CPC claims were directly attributable to pension contributions made on behalf of employees provided to Defendant's union locations. (Compl., ¶ 27). Defendant acknowledges receiving certain invoices that purported to be for "Interim Central States Withdrawal Liability," but denies any liability for those invoices. (Defendant's Answer to First Amended Complaint, ¶ 27).

make a lump sum payment to the fund. (Id., ¶ 28). CPC made the required payment on or about March 23, 2011. (Id.).

According to Plaintiffs, CPC has paid a total of $2,486,742.60 in withdrawal liability to the Central States Pension Fund that is directly attributable to pension contributions made on behalf of the employees CPC provided to Defendant's union locations pursuant to the Driver Lease Agreement.[4] (Compl., ¶ 29). On April 12, 2011, CPC submitted a final invoice to Defendant in the amount of $2,486,742.60, which Defendant has failed and refused to pay. (Id., ¶ 30).

CPC filed its original Complaint in this matter on May 2, 2011. (ECF No. 1). In its First Amended Complaint, CPC alleges Defendant breached the terms of the Driver Lease Agreement and payment schedules thereto, by refusing to reimburse CPC for the amount of withdrawal liability incurred by CPC that was directly attributable to pension contributions made on behalf of employees CPC provided to Defendant's union locations pursuant to the Driver Lease Agreement. (Compl., ¶¶ 33, 35, 40, 42). CPC claims the amounts constitute reimbursable Direct Charges, as they were, "required to be made pursuant to one or more collective bargaining agreements; [were] required to be made pursuant to law or government regulation, namely ERISA and MEPPA (sic); and/or [were] payments that [were] made to or for the benefit of workers covered by the Driver Lease Agreement and in connection with the services provided to Defendant." (Id., ¶¶ 33, 40).

As stated above, the parties filed competing Motions for Summary Judgment on July 3, 2012. (ECF Nos. 61, 65). Both Plaintiff and Defendant contend there exist no genuine issues of material fact, and the Court should determine this dispute as a matter of law.

## SUMMARY JUDGMENT STANDARD

---

[4] This amount consisted of $443,123.02 in "interim" payments, and $2,043.619.58 in a lump sum payment. (Compl., ¶ 29).

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The substantive law determines which facts are critical and which are irrelevant.  Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247.  The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255.  The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

## **DISCUSSION**

As stated above, both CPC and Defendant have moved for summary judgment in their favor on CPC's claim for breach of contract.  CPC asserts that under the terms of the Driver Lease Agreement and payment schedules thereto, Defendant is required to reimburse CPC for a portion of the withdrawal liability payments CPC made to the Central States Pension Fund.  Defendant

conversely maintains that under the clear terms of the agreements, it is not required to make any further payments.

"[T]he meaning of an unambiguous contract presents a question of law appropriate for summary judgment." McCormack v. Citibank, N.A., 100 F.3d 532, 538 (8th Cir. 1996) (citation omitted). "'Conversely, the interpretation of an ambiguous contract presents a question of fact, thereby precluding summary judgment.'" Id. (quoting Michalski v. Bank of Am. Ariz., 66 F.3d 993, 996 (8th Cir. 1995)). Whether the contract is ambiguous is a question of law, and a contract is not ambiguous simply because the parties disagree as to its meaning. Sligo, Inc. v. Nevois, 84 F.3d 1014, 1019 (8th Cir. 1996).

"The primary rule in interpretation of contracts is to ascertain the intent of the parties and give effect to that intent." Farm Bureau Town & Country Ins. of Missouri v. Hilderbrand, 926 S.W.2d 944, 947 (Mo. App. 1996) (citation omitted). "Intent is to be determined from the contract alone and not based on extrinsic or parol evidence unless the contract is ambiguous." Care Center of Kansas City v. Horton, 173 S.W.3d 353, 355 (Mo. App. 2005). "An ambiguity arises where there is duplicity, indistinctness or uncertainty in the meaning of the words used in the contract[,]" Farm Bureau, 926 S.W.2d at 947 (citation omitted), or when the "terms are reasonably open to more than one meaning ...." Care Center of Kansas City, 173 S.W.3d at 355.

Upon consideration, the Court finds the contracts before it are rife with ambiguity. For example, while the payment schedules for the Mason, Ohio, and Fond du Lac, Wisconsin, locations state they are a part of, and subject to, the "Driver Service Agreement" between the parties, the underlying contract presented to the Court is entitled "Driver Lease Agreement." See Rosemann v. Sigillito, 2012 WL 2420131 at *3 (E.D. Mo. Jun. 26, 2012) (internal quotation marks and citations omitted) ("The parties to a contract may incorporate contractual terms by reference to a separate,

noncontemporaneous document,....However, a document can only be incorporated by reference, and thereby become part of the agreement, if the underlying contract makes clear reference to the document [to be incorporated] and describes it in such terms that its identity may be ascertained beyond doubt."). Second, within the payment schedules themselves, the parties refer to the "Agreement", a term that is defined nowhere in the payment schedules. Finally[5], the Court finds the parties' own position statements demonstrate the ambiguity inherent within a crucial provision, the payment schedules' definition of "Direct Charges." As noted above, the provision provides as follows:

> Direct charges are [CPC Logistics'] rates for wages and fringe benefits (initial rates listed below), as well as payments [CPC Logistics] makes under the Agreement to or for the benefit of workers covered by this Schedule "A" or in connection with the services provided to customer. Direct charges also include without limitation, amounts paid pursuant to any applicable collective bargaining agreement, any law or regulation, or any judgment or other resolution of a dispute, as well as costs incurred for road expenses (tolls, scale fees and the like), uniforms, and cash advances paid to workers.

(Compl., ¶ 11, and att. Exhs. B, C). While a literal reading of the second sentence would require Defendant to reimburse CPC for *any* amounts paid "pursuant to...any law or regulation," without regard to whether the payment was related to workers assigned to Defendant's facilities, neither party advocates for this absurd interpretation.[6] Under these circumstances, the Court is unable to ascertain

---

[5] The above examples are enumerated without limitation, and the parties remain free to present evidence on all perceived ambiguities within the contracts at trial.

[6] Defendant naturally argues against this literal interpretation. (See, e.g., Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment, PP. 13-15). For its part, in its Motion for Summary Judgment CPC originally asserts as follows: "This unambiguous language [i.e., "amounts paid pursuant to....any law or regulation] that uses the word 'any' admits of no exception." (Memorandum in Support of Plaintiffs' Motion for Summary Judgment, P. 23). CPC tempers its position in its reply brief, however, as follows:
> [Defendant] also misconstrues CPC's argument on this point, stating that because CPC argues that "any" literally allows no exception, CPC claims it is entitled to reimbursement of payments pursuant to any law or regulation

- 7 -

the intent of the parties from the four corners of the contracts.  Farm Bureau, 926 S.W.2d at 947.

The Court thus must examine extrinsic evidence to determine the parties' intent, and so the parties'

Motions for Summary Judgment will be denied.  See Monsanto Co. v. Garst Seed Co., 241 S.W.3d

401, 407 (Mo. App. 2007) (citations omitted) ("Where an ambiguity exists...summary judgment is

improper because a question of fact exists regarding the intent of the parties.  If the contract is

ambiguous, the parties' intent must be ascertained at trial using parol or extrinsic evidence.").

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 61) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (ECF No. 65) is **DENIED**.

Dated this   30th   day of August, 2012.

/s/Jean C. Hamilton
UNITED STATES DISTRICT JUDGE

---

"regardless of whether the payment has any connection to the actions."
This is clearly not CPC's position.  Rather, CPC maintains that
"reimbursable costs...[must] have a nexus to the employment of drivers on
behalf of [Defendant]."  This required nexus negates [Defendant's]
"slippery slope" or "parade of horribles" argument that if withdrawal
liability is covered by "any law or regulation" then [Defendant] could be
liable for all manner of legal liabilities incurred by CPC "*regardless* of
whether these payments have any direct relationship to the CPC drivers
assigned to [Defendant's] facilities."
(Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiffs' Motion for Summary
Judgment, PP. 6-7 (footnotes omitted)).  Thus, neither side advocates for an "unambiguous"
interpretation of the contract language; instead, each places its own desired limitations on the
provision, limitations found nowhere in the payment schedules themselves.